TONY WEST
Assistant Attorney General
JOHN R. TYLER
Assistant Branch Director
KAREN P. SEIFERT
karen.p.seifert@usdoj.gov
Trial Attorney (NY Bar)
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Ph: (202) 305-0891
Fax: (202) 616-8474

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW, *et al.*, | ) ) ) |
| Plaintiffs, | ) Civil Action No. 10-3375 ) |
| v. | ) DEFENDANTS' MOTION FOR ) SUMMARY JUDGMENT |
| NATIONAL GEOSPATIAL-INTELLIGENCE AGENCY, *et al.*, | ) ) DATE: January 31, 2011 ) TIME: 10:00 a.m. |
| Defendants. | ) DEPT: Courtroom 708 )     Hon. Margaret M. Morrow |

# TABLE OF CONTENTS

**PAGE**

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.    APPLICABLE FOIA AND SUMMARY JUDGMENT STANDARDS . . . 5

II.   NGA'S RESPONSE WAS PROPER UNDER FOIA EXEMPTIONS 1 &3  7

    A.    Glomar Responses Are Appropriate in Instances Such As This  . . . 7

    B.    NGA's Glomar Response Is Proper Under FOIA Exemption 3 . . . . 11

        1.    This National Security Act "refers to the particular types of material to be withheld" and thus falls within the scope of Exemption 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        2.    The requested information would reveal intelligence source and methods, which the National Security Act expressly prohibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    C.    NGA's Glomar Response Is Proper Under FOIA Exemption 1 . . . . 15

        1.    An Original Classification Authority Has Classified the Information At Issue, Which is Owned and Controlled by the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        2.    The Information Falls Within the Protected Categories Listed in E.O. 12,958 Section 1.4 . . . . . . . . . . . . . . . . . . . . . 17

        3.    Unauthorized Disclosure Could Result In Damage to National Security . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

            (a)    Disclosure would damage intelligence activities, sources, and methods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

            (b)    Disclosure would United States' foreign relations  . . . . 21

III.   NASA CONDUCTED A REASONABLE SEARCH  . . . . . . . . . . . . . . . 22

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(s)**

*ACLU v. Dep't of Defense,*
   543 F.3d 59 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Am.-Arab Anti-Discrim. Comm. v. Dep't Homeland Security,*
   516 F.Supp.2d. 83 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Am. Civil Liberties Union v. U.S. Dep't of Justice,*
   265 F. Supp. 2d 20 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Ass'n of Retired R.R. Workers, Inc. v. U.S. R.R. Ret. Bd.,*
   830 F.2d 331 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,11

*Assassination Archives & Research Ctr. v. CIA,*
   334 F.3d 55 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Balridge v. Shapiro,*
   455 U.S. 345 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9,11

*CIA v. Sims,*
   471 U.S. 159 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5 11, 12,13

*Church of Scientology v. U.S. Dep't of the Army,*
   611 F.2d 738 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,10

*Cottone v. Reno,*
   193 F.3d 550 (D.C.Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice,*
   331 F.3d, 918 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Dep't of Justice v. Reporters Comm. for Freedom of the Press,*
   489 U.S. 749 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,4

*Dep't of the Interior v. Klamath Water Users Protective Ass'n,*
   532 U.S. 1 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Edmonds Inst. v. U.S. Dep't of the Interior,*
   383 F. Supp. 2d 105 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 8,10

*Essential Info., Inc. v. U.S. Info. Agency,*
   134 F.3d 1165 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9,11

*Fitzgibbon v. CIA,*
   911 F.2d 755 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . 7, 9,11,14,16

*Frugone v. CIA,*
   169 F.3d 772 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,9,15

*Gardels v. CIA,*

689 F.2d 1100 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8,13

*Goland v. CIA,*
607 F.2d 339 (D.C. Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Ground Saucer Watch, Inc. v. CIA,*
692 F.2d 770 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Halperin v. CIA,*
629 F.2d 144 (D.C. Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Hunt v. CIA,*
981 F.2d 1116 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,8,13

*Iturralde v. Comptroller of the Currency,*
315 F.3d 311 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*John Doe Agency v. John Doe Corp.,*
493 U.S. 146 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Kelley v. CIA,*
Civ. No. 00-2498, 2002 WL 34463900 (D.D.C. Aug. 8, 2002) . . . . . . . . 14,16

*King v. U.S. Dep't of Justice,*
830 F.2d 210 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Kissinger v. Reporters Comm. for Freedom of the Press,*
445 U.S. 136 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4,5

*Krikorian v. Dep't of State,*
984 F.2d 461 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Lahr v. Nat'l Transp. Safety Bd.,*
453 F.Supp.2d 1153 (C.D. Cal. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Larson v. Dep't of State,*
565 F.3d 857 (D.C. Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 10

*Lewis v. IRS,*
823 F.2d 375 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*MacLean v. U.S. Dep't of Army,*
No. 05-CV-1519, 2007 WL 935604 (S.D. Cal. March 6, 2007) . . . . . . . . . . . 9

*Maynard v. CIA,*
986 F.2d 547 (1st Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Meeropol v. Meese,*
790 F.2d 942 (D.C. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Miller v. Casey,*
730 F.2d 773 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Miller v. U.S. Dep't of State,*
779 F.2d 1378 (8th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23,25

*Minier v. CIA*,
    88 F.3d 796 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7, 8,10,11

*Moore v. Bush*,
    601 F.Supp.2d 6 (D.D.C. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Morley v. CIA*,
    508 F.3d 1108 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Morley v. CIA*,
    Civ. No. 03-2545, 2010 WL 1233381 (D.D.C. Mar. 30, 2010) . . . . . . . . . . . . 9

*Natural Res. Def. Council v. Dep't of Def.*,
    388 F.Supp.2d 1086 (C.D. Cal. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*New York Times Co. v. U.S. Dep't of Defense*,
    499 F.Supp.2d 501 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Phillippi v. CIA*,
    546 F.2d 1009 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Ray v. U.S. Dep't of Justice*,
    908 F.2d 1549 (11th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Riquelme v. CIA*,
    453 F. Supp. 2d 103 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Safecard Servs., Inc. v. SEC*,
    926 F.2d 1197 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 24

*Schoenman v. FBI*,
    No. 04-2202, 2009 WL 763065 (D.D.C. Mar. 19, 2009) . . . . . . . . . . . . . . . . 15

*Students Against Genocide v. Dep't of State*,
    257 F.3d 828 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Summers v. Dep't of Justice*,
    140 F.3d 1077 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Talbot v. CIA*,
    578 F.Supp.2d 24 (State) (D.D.C. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Toolasprashad v. Bureau of Prisons*,
    474 F.Supp.2d 14 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Wheeler v. CIA*,
    271 F. Supp. 2d 132 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Wilner v. NSA*,
    592 F.3d 60 (2nd Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Zemansky v. U.S. EPA*,
    767 F.2d 569 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 22,24

**STATUTES**

5 U.S.C. § 552(a)(4)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 6

5 U.S.C. § 552(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

5 U.S.C. §552(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

5 U.S.C. § 552(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9,11

5 U.S.C. §552(b)(3)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

10 U.S.C. § 457 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

50 U.S.C. § 403-1(i)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,3,11, 12, 13

32 C.F.R. 286.1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

32 C.F.R. § 286.12(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

32 C.F.R. § 293.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**LEGISLATIVE MATERIAL:**

H.R. Rep. No. 89-1497 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

S.Rep. No. 93-1200 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**EXECUTIVE ORDERS:**

Exec. Order No. 12,951, 60 Fed. Reg. 10,789 (Feb. 22, 1995), . . . . . . . . . . . 14, 15

Exec. Order No. 12,958, 60 Fed. Reg. 19,825 (April 17, 1995) . . . . . . . . . . . . . 15

Exec. Order No. 13,292, 68 Fed. Reg. 15,315 (Mar. 25, 2003), . . . . . . . . . . . . . 15

Exec. Order No. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009) . . . . . . . . . . . . . 2, 15-18

## <u>NOTICE OF MOTION FOR SUMMARY JUDGMENT</u>

PLEASE TAKE NOTICE that defendants will move pursuant to Fed. R. Civ. P. 56 for summary judgment in the Courtroom of the Honorable Margaret M. Morrow on January 31, 2011, at 10:00 a.m.   This motion will seek entry of summary judgment in favor of defendants, and dismissal of all claims with respect thereto.

The grounds for this motion are that no genuine issue of material fact exists and that defendants are entitled to summary judgment as a matter of law.   The grounds for this motion are set forth in the memorandum of points and authorities submitted herewith, and upon such other and further arguments, documents, and grounds as may be advanced to the Court in the future.   This motion is made following the conferences of counsel pursuant to L.R. 7-3, as described in the Statement of Conference, submitted herewith.

Dated: October 18, 2010                    Respectfully submitted,

                                           TONY WEST
                                           Assistant Attorney General

                                           JOHN R. TYLER
                                           Assistant Branch Director

                                           /s/ Karen P. Seifert
                                           KAREN P. SEIFERT (NY Bar)
                                           Trial Attorney
                                           United States Department of Justice
                                           20 Massachusetts Avenue, N.W.
                                           Washington, D.C. 20001
                                           Ph: (202) 305-0891
                                           karen.p.seifert@usdoj.gov

1

### <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2      This action arises from plaintiffs' Freedom of Information Act ("FOIA")

3    request to defendants the National Geospatial-Intelligence Agency ("NGA") and

4    the National Aeronautics and Space Administration ("NASA").  Plaintiffs' FOIA

5    requests seek satellite imagery of the Cuban coastal waters, taken on or about

6    February 24, 1996, and documents related to those images.  NGA responded with a

7    Glomar response—that it could not confirm or deny the existence of responsive

8    records—for national security reasons.  NASA, in response to plaintiffs' request,

9    conducted a reasonable search of its offices where responsive records would be

10   located if they existed, but found none.  Plaintiffs brought this suit, contesting the

11   agencies' responses.

12      NGA's Glomar response is valid, and thus NGA is entitled to summary

13   judgment, because the fact of the existence or nonexistence of responsive records

14   is itself information that is exempt from disclosure under FOIA.  First, NGA's

15   confirmation whether or not responsive records exist would reveal information

16   about "NGA's interest, ability, or involvement in obtaining satellite data, and the

17   breadth and scope of that interest."  Barlow Declaration ¶ 12 ("Barlow Decl.").  As

18   such, this fact is exempt from production under FOIA Exemption 3, because it falls

19   within the scope of the National Security Act's protection of "intelligence sources

20   and methods from unauthorized disclosure." 50 U.S.C. § 403-1(i)(1).  In addition,

1   the existence or nonexistence of responsive records is also exempt from disclosure

2   under FOIA Exemption 1 because this information is properly classified under

3   Executive Order No. 13,526, as demonstrated below.  Owing to NGA's expertise

4   in national security matters, its declaration supporting these Exemptions is entitled

5   to deference, and based on that declaration, NGA is entitled to summary judgment.

6        As is also demonstrated below, NASA is entitled to summary judgment

7   because it satisfied its FOIA obligations by conducting a search reasonably

8   calculated to discover responsive records.

9                           **BACKGROUND**

10       By letter dated December 29, 2009, plaintiffs requested under FOIA the

11   following records from NGA and NASA:

12       1. Any satellite images, satellite imagery, satellite photographs, or

13          satellite video images of the area in which an incident took place

14          on February 24, 1996 over or near the north coast of Cuba in which

15          two aircraft flown by the Brothers to the Rescue organization of

16          Florida were intercepted in flight and shot down by Cuban MiGs,

17          including but not limited to satellite images, satellite imagery,

18          satellite photographs, or satellite video images showing any of the

19          Brothers to the Rescue or Cuban aircraft involved in the incident.

20          We are requesting records whether created any time before, during

Defendants' Motion for Summary Judgment - page 2

1    or after the downing of the two aircraft, including any images or

2    photos of any wreckage.

3       2.   Any documents or records relating to the items sought in number 1

4    above including but not limited to reports requests, assessments,

5    data compilations, directives, instructions, guidance, memoranda,

6    correspondence, notes, indices, cables, telexes, telegrams, or

7    letters, whether maintained in paper, digital, video, digital tape,

8    audio  tape  or  any  other  preserved  form,  regarding  the

9    aforementioned  satellite  images,  satellite  imagery,  satellite

10   photographs or satellite video images.

11   Exhibit A at 31; Exhibit B at 39.

12       NGA  acknowledged  receipt  of  plaintiffs'  request  on  January  12,  2010,

13   Exhibit C at 42, and denied plaintiffs' request on April 6, 2010, Exhibit D at 45.

14   NGA responded that it "can neither confirm nor deny the existence or nonexistence

15   of records responsive to [plaintiffs'] request."  *Id.* at 47.  NGA stated that the

16   "request is denied pursuant to sections '(b)(1)' and '(b)(3)' of the FOIA."  *Id.*[1]  On

---

[1] NGA  initially  stated  that  10  U.S.C.  §  457  exempted  the  requested
information under FOIA Exemption 3.  *Id.*  Subsequently, the agency determined
that the National Security Act § 102A(i)(1) provided a more accurate justification
for withholding the fact of the existence of records under Exemption 3.  This issue
is of no consequence because the court conducts *de novo* review of the agency's
decision.  *See* 5 U.S.C. § 552(a)(4)(B); *see also Dep't of Justice v. Reporters
Comm. for Freedom of the Press*, 489 U.S. 749, 755 (1989) (noting that the FOIA

Defendants' Motion for Summary Judgment - page 3

1    April 9, 2010, plaintiffs appealed NGA's denial of their FOIA request.  Exhibit E

2    at 49.  NGA did not respond to plaintiffs' appeal before plaintiff filed suit in this

3    Court on May 5, 2010.  NGA ceased processing plaintiffs' administrative appeal

4    after plaintiffs filed suit.  Barlow Decl. ¶ 11.

5           NASA has no record of receiving plaintiffs' FOIA request until March 18,

6    2010.  Exhibit F at 54; Young Decl. ¶ 8.  On that date, NASA received an "appeal"

7    from plaintiffs that included the December 29, 2009, FOIA request.  *Id.*  Between

8    March 22-23, 2010, NASA forwarded the request to the NASA Headquarters

9    offices deemed most likely to have responsive information, and all ten of NASA's

10   Centers.  Young Decl. ¶¶ 16, 19.  All the Headquarters offices and Centers replied

11   with a "No Records" response regarding plaintiffs' request.  Young Decl. ¶¶ 17,

12   21.

13          On May 5, 2010, plaintiffs filed this suit to contest the agencies' actions.

14                                       **ARGUMENT**

15          Under the applicable FOIA precedent, NGA and NASA are entitled to

16   summary judgment on plaintiffs' FOIA claim.  NGA's declaration supports that

17   the agency properly declined, under FOIA Exemptions 1 and 3, to confirm or deny

---

"directs the district courts to 'determine the matter de novo'" (citing 5 U.S.C. §
552(a)(4)(B)); *accord ACLU v. Dep't of Defense*, 543 F.3d 59, 66 (2d Cir. 2008);
*Summers v. Dep't of Justice*, 140 F.3d 1077, 1080 (D.C. Cir. 1998).

Defendants' Motion for Summary Judgment - page 4

1    the existence or nonexistence of records responsive to plaintiffs' request.  NASA's

2    declaration supports that it adequately searched for responsive records.

3    **I. APPLICABLE FOIA AND SUMMARY JUDGMENT STANDARDS**

4           FOIA provides private citizens access government records.  *See CIA v. Sims*,

5    471 U.S. 159, 166-67, 105 S. Ct. 1881, 85 L. Ed. 2d 173 (1985).  FOIA's "basic

6    purpose" reflects a "general philosophy of full agency disclosure unless

7    information is exempted under clearly delineated statutory language." *John Doe*

8    *Agency v. John Doe Corp.*, 493 U.S. 146, 152, 110 S. Ct. 471, 107 L. Ed. 2d 462

9    (1989).  "Congress recognized, however, that public disclosure is not always in the

10   public interest . . . ." *Sims*, 471 U.S. at 166-67.  Accordingly, in passing FOIA,

11   "Congress sought 'to reach a workable balance between the right of the public to

12   know and the need of the Government to keep information in confidence to the

13   extent necessary without permitting indiscriminate secrecy.'" *John Doe Agency*,

14   493 U.S. at 152 (quoting H.R. Rep. No. 89-1497, at 5 (1966), *reprinted in* 1966

15   U.S.C.C.A.N. 2418, 2423).

16          To strike such a balance, Congress included in FOIA nine exemptions that

17   protect certain documents from public disclosure.  *See* 5 U.S.C. § 552(b).  "A

18   district court only has jurisdiction to compel an agency to disclose improperly

19   withheld agency records," *i.e.*, records that do "not fall within an exemption."

20   *Minier v. CIA*, 88 F.3d 796, 803 (9th Cir. 1996); *see also* 5 U.S.C. § 552(a)(4)(B);

1    *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 150, 100 S.

2    Ct. 960, 63 L. Ed. 2d 267 (1980).   While the court should narrowly construe

3    FOIA's exemptions, *see Department of the Interior v. Klamath Water Users*

4    *Protective Ass'n*, 532 U.S. 1, 8, 121 S. Ct. 1060, 149 L. Ed. 2d 87 (2001), the

5    exemptions "are intended to have meaningful reach and application," *John Doe*,

6    493 U.S. at 152.

7        The government agency bears the burden of showing that it properly

8    searched for responsive records and that the requested records are properly

9    withheld under an exemption.  *See* 5 U.S.C. § 552(a)(4)(B); *Church of Scientology*

10   *v. U.S. Dep't of the Army,* 611 F.2d 738, 742 (9th Cir. 1979).  The agency typically

11   does so by moving for summary judgment, the procedural vehicle by which most

12   FOIA actions are resolved, and submitting detailed declarations detailing its search

13   and showing that the requested information falls within the claimed exemptions.

14   *See Natural Res. Def. Council v. Dep't of Def.*, 388 F. Supp. 2d 1086, 1094-95

15   (C.D. Cal. 2005).  The agency's detailed, non-conclusory declaration is entitled to

16   a "presumption of good faith."  *Safecard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200

17   (D.C. Cir. 1991) (quotation omitted); *see also Zemansky v. U.S. EPA*, 767 F.2d

18   569, 574 (9th Cir. 1985).

19       Moreover, courts afford higher deference to the agency's declaration

20   regarding withholding in instances of national security—"a uniquely executive

1   purview." *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d, 918 926-

2   27 (D.C. Cir. 2003).   Although the court still conducts *de novo* review of an

3   agency's actions, "*de novo* review in FOIA cases is not everywhere alike." *Ass'n*

4   *of Retired R.R. Workers, Inc. v. U.S. R.R. Ret. Bd.*, 830 F.2d 331, 336 (D.C. Cir.

5   1987).   Because "courts have little expertise in either international diplomacy or

6   counterintelligence operations, [they] are in no position to dismiss the [agency's]

7   facially reasonable concerns" about the harm that disclosure could cause to

8   national security.   *Frugone v. CIA*, 169 F.3d 772, 775 (D.C. Cir. 1999).   As the

9   Ninth Circuit directed, for exemptions related to national security, "the district

10   court [is] required to accord 'substantial weight' to [the agency's] affidavits"[2] as

11   long as it is not "controverted by contrary evidence in the record or by evidence of

12   [agency] bad faith." [3]   *Hunt v. CIA,* 981 F.2d 1116, 1119 (9th Cir. 1992) (citing

13   *Miller v. Casey*, 730 F.2d 773, 777 (D.C. Cir. 1984).

14   **II. NGA'S RESPONSE WAS PROPER UNDER FOIA EXEMPTIONS 1 & 3**

15   **A. Glomar Responses Are Appropriate in Instances Such As This**

16       The invocation of the Glomar response to FOIA requests has been routinely

17   upheld by the courts. *E.g. Minier*, 88 F.3d at 800 (citing *Hunt*, 981 F.2d at 1118)

---

[2] *Accord Larson v. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009); *Goland v. CIA,* 607 F.2d 339, 352 (D.C. Cir. 1978) (quoting S.Rep. No. 93-1200, at 12 (1974)); *Am. Civil Liberties Union v. U.S. Dep't of Justice*, 265 F. Supp. 2d 20, 27 (D.D.C. 2003).
[3] *Accord Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990); *Goland*, 607 F.2d at 352 (quoting S.Rep. No. 93-1200, at 12 (1974)).

("[A] government agency may issue a 'Glomar Response,' that is, refuse to confirm or deny the existence of certain records.").[4]   In some instances, an agency's mere acknowledgement of responsive records may "cause harm cognizable under an FOIA exception."   *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982).  As such, a Glomar response is appropriate where confirmation of the existence *vel non* of responsive records is itself exempt from disclosure under FOIA.  *Minier*, 88 F.3d at 800 (citing *Hunt*, 981 F.2d at 1118).[5]  To be clear, in a Glomar case, the question is not whether the underlying documents are themselves exempt from disclosure under FOIA, but rather whether the fact of the existence of responsive documents is exempt from disclosure.  *See Phillippi*, 546 F.2d at 1013 n.7 ("[T]he 'document' the Agency is currently asserting the right to withhold is confirmation or denial of the existence of the requested records . . . .").

Courts have consistently upheld Glomar responses where, as here, confirming or denying the existence of records would either reveal classified information protected by FOIA Exemption 1, or disclose information protected by

---

[4]  The validity of the Glomar Response was first tested in *Phillippi v. CIA*, 546 F.2d 1009, 1011 (1976), where the D.C. Circuit upheld the CIA's refusal to confirm or deny the existence of records connected to activities of a ship named the Hughes Glomar Explorer.

[5]  NGA's regulations specifically require the agency to "neither confirm nor deny the existence or nonexistence of the record being requested" in such an instance.  32 C.F.R. § 286.12(a)(1) (promulgated Nov. 25, 1998) (applicable to NGA through 32 C.F.R. § 293.3 (promulgated June 20, 2000)); *see also* 32 C.F.R. 286.1(b) (promulgated Nov. 25, 1998).

statute in contravention of FOIA Exemption 3.  *See*, *e.g.*, *Minier*, 88 F.3d at 800-01 (Exemption 3); *Hunt*, 981 F.2d at 1118 (Exemption 3); *see also Larson*, 565 F.3d at 861-62 (Exemptions 1, 3); *Frugone*, 169 F.3d at 774-75 (Exemptions 1, 3); *Morley v. CIA*, Civ. No. 03-2545, 2010 WL 1233381, at *9-*10 (D.D.C. Mar. 30, 2010) (Exemption 3); *Wheeler v. CIA*, 271 F. Supp. 2d 132, 140 (D.D.C. 2003) (Exemption 1).

A Glomar response is necessary to ensure that the agency does not reveal classified information simply through a pattern of responses.  "In order to be credible and effective, NGA must use the Glomar response consistently in all cases where the existence or nonexistence of records responsive to a FOIA request is a classified fact, including those instances in which NGA does not possess records responsive to a particular request."  Barlow Decl. ¶ 15; *see also MacLean v. U.S. Dep't of Army*, No. 05-CV-1519, 2007 WL 935604, at *18 n.12 (S.D. Cal. March 6, 2007) (requiring consistent use).  If the agency only invoked a Glomar response if it had responsive records, and notified requesters when it did not have responsive records, "the Glomar response would unsurprisingly be interpreted as an admission that responsive records exist."  Barlow Decl. ¶ 15.  The agency's only protection when the fact of the existence of records is exempt is to provide a consistent response regarding all records of that sort, regardless of whether or not the agency actually possesses responsive records in each instance.

1    Furthermore, if the Glomar response was not invoked, the mere processing

2  of any responsive, but exempt, records could reveal classified and exempt

3  information even when the underlying records were protected from disclosure.  For

4  instance, in producing an itemized *Vaughn* index, the agency would need to reveal

5  "a short description of the content of each individual document," which could

6  reveal classified and exempt information.   *Edmonds Inst. v. U.S. Dep't of the*

7  *Interior*, 383 F. Supp. 2d 105, 109 (D.D.C. 2005).  The Glomar response provides

8  the agency the ability to protect its national security concerns.

9    NGA invoked Exemption 1 and Exemption 3, and has submitted a detailed

10  declaration[6] explaining why the existence or nonexistence of the requested records

11  is itself information exempt from disclosure under FOIA.   NGA's Glomar

12  responses are separately and independently justified under each exemption.

13  "[A]gencies may invoke the exemptions independently and courts may uphold

14  agency action under one exemption without considering the applicability of the

15  other."  *Larson*, 565 F.3d at 862-63 (citing *Gardels*, 689 F.2d at 1106-07); *see*

16  *Minier*, 88 F.3d at 800-01.

17

---

[6] When claiming an exemption, the agency "need not specify its objections [to disclosure] in such detail as to compromise the secrecy of the information" and can meets its burden by submitting affidavits consisting of "reasonably detailed descriptions of the documents and allege facts sufficient to establish an exemption."  *Lewis v. IRS,* 823 F.2d 375, 378 (9th Cir. 1987) (quoting *Church of Scientology*, 611 F.2d at 742); *see also Minier*, 88 F.3d at 803-04.

**B. NGA's Glomar Response Is Proper Under FOIA Exemption 3**

NGA properly invokes Exemption 3, which applies to records that are "specifically exempted from disclosure" by other federal statutes "if that statute—establishes particular criteria for withholding the information or refers to the particular types of material to be withheld."   5 U.S.C. § 552(b)(3).   In promulgating FOIA, Congress included Exemption 3 to recognize the existence of collateral statutes that limit the disclosure of information held by the government, and to incorporate such statutes within FOIA's exemptions.   *See Balridge v. Shapiro*, 455 U.S. 345, 352-53, 102 S. Ct. 1103, 71 L. Ed. 2d 199 (1982); *Essential Info., Inc. v. U.S. Info. Agency*, 134 F.3d 1165, 1166 (D.C. Cir. 1998).   Under Exemption 3, "the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage." *Fitzgibbon*, 911 F.2d at 761-62.[7]

NGA's affidavit supports the "two-part inquiry [that] determines whether Exemption 3 applies to a given case." *Minier,* 88 F.3d at 800-01 (citing *Sims*, 471 U.S. at 167).  "First, a court must determine whether there is a statute within the scope of Exemption 3.  Then, it must determine whether the requested information falls within the scope of the statute." *Id.*

---

[7] Unlike other FOIA Exemptions, the harm to the national security that would result were the information disclosed is *not* the dispositive inquiry.  *See Sims*, 471 U.S. at 167; *Fitzgibbon*, 911 F.2d at 761-62 (quoting *Assoc. of Retired R.R. Workers*, 830 F.2d at 336)).

1. The National Security Act "refers to the particular types of material to be withheld" and thus falls within the scope of Exemption 3

In this case, § 102A(i)(1) the National Security Act of 1947 (NSA), 50 U.S.C. § 403-1(i)(1), is a statute that falls "within the scope" of Exemption 3. NSA § 102A(i)(1) mandates that the Director of National Intelligence ("DNI")[8] "protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 403-1(i)(1). The Supreme Court has held that "'intelligence sources and methods,' clearly 'refers to particular types of matters,' 5 U.S.C. § 552(b)(3)(B), and thus qualifies as a withholding statute under Exemption 3. The 'plain meaning' of the relevant statutory provisions is sufficient to resolve the question." *Sims*, 471 U.S. at 167 (collecting cases). The NSA provides "wide-ranging authority" to protect intelligence sources and methods. *Id.* at 177.[9]

---

[8] Courts have recognized that not just the DNI, but also CIA and other agencies may rely upon the amended NSA § 102A(i)(1) to withhold records under FOIA. *See, e.g., Larson*, 565 F.3d at 862-63, 865, 869 (CIA, NSA); *Krikorian v. Dep't of State*, 984 F.2d 461, 465 (D.C. Cir. 1993) (State); *Moore v. Bush*, 601 F. Supp. 2d 6, 15 (D.D.C. 2009) (NSA); *Talbot v. CIA*, 578 F. Supp. 2d 24, 29 (D.D.C. 2008) (State); *New York Times Co. v. U.S. Dep't of Defense*, 499 F. Supp. 2d 501 (S.D.N.Y. 2007) (DOD & DOJ); *Lahr v. Nat'l Transp. Safety Bd.*, 453 F. Supp. 2d 1153, 1172 (C.D. Cal. 2006) (CIA), *reversed in part and remanded* 569 F.3d 964 (9th Cir. 2009).

[9] Furthermore, the Court observed that Congress did not limit the scope of "intelligence sources and methods" in any way. *Id.* Rather, Congress "simply and pointedly protected all sources of intelligence that provide, or are engaged to provide, information the Agency needs to perform its statutory duties with respect to foreign intelligence." *Id.* at 169-70.

1      The Ninth Circuit has recognized that NSA § 102A(i)(1), 50 U.S.C. § 403-

2   1(i)(1) operates as a "near-blanket FOIA exemption." *Hunt*, 981 F.2d at 1120,

3   1121 (quotation omitted).[10]   "[T]he uniform view among other federal courts" is

4   that NSA § 102A(i)(1), 50 U.S.C. § 403-1(i)(1) qualifies as a withholding statute

5   under Exemption 3. *Sims*, 471 U.S. at 167-68.

6      2. The requested information would reveal intelligence source and methods,

7         which the National Security Act expressly prohibits

8      NGA's affidavit shows that "the requested information falls within the scope

9   of the statute," *Minier*, 88 F.3d at 800-01, because responding to plaintiffs' FOIA

10   request "can reasonably be expected to lead to unauthorized disclosure of

11   intelligence sources and methods." *Halperin v. CIA*, 629 F.2d 144, 147 (D.C. Cir.

12   1980).   In order to respond to plaintiffs' request, NGA would have to reveal

13   whether or not a satellite captured images of a specific spot on earth at a specific

14   moment, and further, whether or not a satellite is able to capture images of the

15   earth at a certain resolution.   Such an acknowledgment would expose "NGA's

---

[10] The mandate to withhold information under Exemption 3 pursuant to the NSA is broader than authority to withhold under Exemption 1 pursuant to Executive Order ("E.O.") No. 13,526. *See Gardels*, 689 F.2d at 1107 (executive order governing classification "not designed to incorporate into its coverage the CIA's full statutory power to protect all of its 'intelligence sources and methods'"). For example, unlike E.O. 13,526, the NSA does not require a determination that the disclosure of information would be expected to result in damage to the national security. *Compare* 50 U.S.C. §§ 403-1(i)(1), 403g, *with* E.O. 13,526, § 1.1(a)(4); *see also Assassination Archives & Research Ctr. v. CIA*, 334 F.3d 55, 58 n.3 (D.C. Cir. 2003).

interest, ability, or involvement in obtaining satellite data, and the breadth and scope of that interest."   Barlow Decl. ¶ 12.   In other words, through such an acknowledgement, foreign intelligence services could learn "whether or not NGA maintains an intelligence interest in specific activities or locations."  Barlow Decl. ¶16.   Furthermore, it would also divulge the "capabilities or limitations" of a satellite.   *Id.*[11]   Space-based national intelligence reconnaissance systems and imagery acquired there from are, by their very function, an "intelligence source" and a "method" by which the United States gathers intelligence.  Barlow Decl. ¶ 2. Revealing satellite targets and capabilities falls within NSA § 102A(i)(1), 50 U.S.C. § 403-1(i)(1).

The possibility that some capability or information about an intelligence source or method might be "generally known" does not lessen the statute's authority to exempt them from disclosure. [12]   *See, e.g., Fitzgibbon*, 911 F.2d at 763

---

[11]   Although the harm from disclosure need not be considered in the Exemption 3 analysis, revealing such information could enrich terrorist organizations and foreign intelligence services with indispensable information regarding which targets the United States is able to surveil.  *See, e.g.*, Barlow Decl. ¶¶ 16-18.

[12]   In 1995, by Executive Order ("E.O.") No. 12,951, 60 Fed. Reg. 10,789 (Feb. 22, 1995), President Clinton declassified obsolete satellite imagery collected via the ARGON, CORONA, and LANYARD systems between 1959 and 1972.  In 2002, the Director of Central Intelligence declassified obsolete satellite imagery collected via the KH-7 and KH-9 systems between 1963 and 1980.  *See* National Archive, Press Release: National Archives Releases Recently Declassified Satellite Imagery, October 9, 2002, *available at* http://www.archives.gov/press/press-releases/2003/nr03-02.html.  Satellite imagery related to all other missions "shall

(holding Exemption 3 protects against such disclosure).  "[T]he [agency] may refrain from disclosing the fact that it uses even the simplest of intelligence gathering methods."  *Schoenman v. FBI*, No. 04-2202, 2009 WL 763065, at *25 (D.D.C. Mar. 19, 2009).  NGA's affidavit details that acknowledging the existence of documents responsive to plaintiffs' request would disclose intelligence sources and methods.  NGA's determination related to this specific instance is entitled to a good faith presumption and NGA is entitled to summary judgment.

## C. NGA's Glomar Response Is Proper Under FOIA Exemption 1

NGA also properly invoked Exemption 1, which protects from disclosure records that are: "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order."  5 U.S.C. § 552(b)(1).  Executive Order ("E.O.") No. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009),[13] which governs the classification of national security information, "specifically countenances the Glomar Response, permitting a classifying agency to refuse to confirm or deny the existence or nonexistence of requested records

---

be kept secret in the interests of national defense and foreign policy until deemed otherwise by the Director of [National] Intelligence."  E.O. 12,951.

[13]   At the time the search was conducted, E.O. 12,958, 60 Fed. Reg. 19,825 (April 17, 1995), as amended by E.O. 13,292, 68 Fed. Reg. 15,315 (Mar. 25, 2003), was the standing Executive Order governing NGA's search.  Therefore, Mr. Barlow's declaration refers to E.O. 12,958, as amended, in describing NGA's response.  However, on December 29, 2010, President Obama signed E.O. 13,526, which supersedes E.O. 12,958 and is now in effect.

Defendants' Motion for Summary Judgment - page 15

1    whenever the fact of their existence or nonexistence is itself classified." *Wilner v.*

2    *NSA*, 592 F.3d 60, 71 (2d Cir. 2009) (discussing E.O. 12,958, the predecessor to

3    E.O. 13,526, that included the same operative language); *see also Kelley*, 2002 WL

4    34463900, at *3.

5           In this case, whether or not records exist that are responsive to plaintiffs'

6    FOIA request is classified information within the purview of E.O. 13,526, and thus

7    Exemption 1, because the withheld information satisfies four conditions:

8           (1) an original classification authority is classifying the information;

9           (2) the information is owned by, produced by or for, or is under the

10          control of the United States Government; (3) the information falls

11          within one or more of the categories of information listed in section

12          1.4 of th[e] order; and (4) the original classification authority

13          determines that the unauthorized disclosure of the information

14          reasonably could be expected to result in damage to the national

15          security, which includes defense against transnational terrorism, and

16          the original classification authority is able to identify or describe the

17          damage.

18    E.O. 13,526 § 1.1(a).   The Court, when addressing the fourth condition, owes

19    deference to NGA's determination about potential damage to national security, as

20    discussed above. *See Fitzgibbon*, 911 F.2d at 766; *Frugone*, 169 F.3d at 775.

Defendants' Motion for Summary Judgment - page 16

1          1. <u>An Original Classification Authority Classified the Information at</u>

2             <u>Issue, Which Is Owned and Controlled by the United States</u>

3           Under the first condition of E.O. 13,526, declarant Barry M. Barlow,

4      Director of NGA's Acquisition Directorate, has original classification authority

5      under the Executive Order and has affirmed that the existence or nonexistence of

6      the requested records is itself a properly classified information.  Barlow Decl. ¶¶ 4,

7      23.  Mr. Barlow furthermore affirms under the second condition of E.O. 13,526,

8      that the existence or nonexistence of responsive records is "information" that is

9      owned by and under the control of the United States Government.  Barlow Decl. ¶

10     23.

11         2. <u>The Information Falls Within the Categories Listed in E.O. 13,526 § 1.4</u>

12          Under the Executive Order's third condition, Mr. Barlow affirms that the

13     existence or nonexistence of responsive records falls within two categories set

14     forth in E.O. 13,526 § 1.4.  First, Mr. Barlow affirms that the fact of the existence

15     or nonexistence of responsive records concerns 1.4(c) "intelligence activities

16     (including covert action) [and] intelligence sources or methods."  *See* Barlow Decl.

17     ¶ 23.  Second, Mr. Barlow affirms that the fact of the existence or nonexistence of

18     records concerns section 1.4(d) "foreign relations or foreign activities of the United

19     States."  *See* Barlow Decl. ¶ 23.  In both instances, the declarant articulates with

1   reasonable specificity why the fact falls under these two categories.  Barlow Decl.

2   ¶¶24-32.  Therefore, the withheld information satisfies E.O. 13,526 § 1.1(a)(3).

3          3. <u>Unauthorized Disclosure Could Result in Damage to National Security</u>

4          NGA's declarant further explains in detail how, under the fourth condition

5   of E.O. 13,526, the unauthorized disclosure of this information reasonably could be

6   expected to cause serious damage to the national security of the United States by

7   implicating intelligence activities, intelligence sources and methods, and U.S.

8   foreign relations.  *See generally* Barlow Decl. ¶¶ 24-32.  First, disclosure could

9   adversely impact "intelligence activities (including covert action) [and]

10  intelligence sources or methods," E.O. 13,526 § 1.4(c), because it could expose the

11  areas of the world where NGA's has, or has not been, targeting, and the

12  technological capability, or lack thereof, of the satellite.  Barlow Decl. ¶¶ 16-18,

13  24-29.  Second, disclosure could adversely impact "foreign relations or foreign

14  activities of the United States," E.O. 13,526 § 1.4(d), because the presence of

15  responsive records could be "construed by a foreign government, whether friend or

16  foe, to mean that NGA has collected intelligence information on its citizens or

17  resident aliens."  Barlow Decl. ¶ 31.

18       *(a) Disclosure would damage intelligence activities, sources, and methods*

19         If NGA were to confirm or deny the existence of records responsive to

20  plaintiffs' request, it would reveal whether or not NGA maintains an intelligence

Defendants' Motion for Summary Judgment - page 18

1   interest in a particular area of world, as well as the breadth and scope of any such

2   interest.  Barlow Decl. ¶ 12.  Such a response would necessarily expose whether

3   NGA intelligence methods have or have not been utilized for a specific target.

4   Barlow Decl. ¶ 14.  Consequently, foreign intelligence services and terrorist

5   organizations would gain valuable knowledge about which targets are have been,

6   and may continue to be, monitored by NGA.  Barlow Decl. ¶ 24.  The disclosure of

7   this fact would allow United States' adversaries to "gather information from

8   myriad sources, analyze this information, and create ways to defeat NGA activities

9   from seemingly disparate pieces of information."  Barlow Decl. ¶ 24.  "For

10  instance, knowing where and when NGA seeks to collect data, foreign adversaries

11  could seek to provide false sources of data or to prevent collection of data

12  altogether."  Barlow Decl. ¶ 16.

13        In addition, if NGA were to confirm or deny the existence of records

14  responsive to plaintiffs' request, it would reveal the technological capability, or

15  lack thereof, of a satellite.  Barlow Decl. ¶¶ 12, 25.  If NGA confirmed the

16  existence of responsive imagery, it may reveal NGA's "sophisticated technological

17  tools, liaison relationships, and NGA's identification of targets for intelligence

18  collection activity, among other sensitive sources and methods."  Barlow Decl. ¶

19  25; *see also id.* ¶¶ 12, 14, 16.  If NGA stated it did not have responsive imagery, it

20  might conversely reveal that NGA lacked the technological capability necessary to

capture responsive imagery.  Barlow Decl. ¶¶ 16, 17.  With such information, foreign intelligence services would gain valuable knowledge about NGA's capability to monitor targets.  Barlow Decl. ¶ 17.  "[T]hese admissions would be of great benefit [to U.S. adversaries], by enabling the foreign services to redirect their resources to identify potential NGA sources, circumvent the NGA's monitoring efforts, and generally enhance their intelligence activities at the expense of the United States."  Barlow Decl. ¶ 27.  "Knowledge of NGA's capabilities and areas of interest would be the foundation of any foreign attempt to develop 'denial and deception' techniques to defeat those capabilities."  Barlow Decl. ¶ 17

Furthermore, NGA must also "prevent indirect references to such a source or method."  Barlow Decl. ¶ 28.  By reviewing officially-released information, foreign intelligence services may gather information and "deduce means and methods (from disparate and even seemingly unimportant details) to defeat NGA collection efforts."  Barlow Decl. ¶ 28.  Combining "seemingly innocuous" released information with other publicly-available data, "the foreign intelligence service could cobble together those responses to create a picture of NGA's overall capabilities and intelligence interests."  Barlow Decl. ¶¶ 18, 28.

NGA's affidavit provides sufficient detail to demonstrate the logical connection between the fact of the existence or nonexistence of records and the agencies' proper decisions to neither confirm nor deny it.  Providing any response

to plaintiffs' request would cause serious damage to the national security by divulging the scope and boundaries of the United States' intelligence activities and operations.

*(b) Disclosure would damage United States' foreign relations*

It follows, as well, that revealing the existence or nonexistence of the requested records could adversely impact U.S. foreign relations. If NGA were to confirm the existence of responsive records, such a response could be "construed by a foreign government, whether friend or foe, to mean that NGA has collected intelligence information on its citizens or resident aliens." Barlow Decl. ¶ 31. While it may be generally known, for example, that the United States collects foreign satellite intelligence and conducts satellite operations in other countries, a specific "acknowledgement could suggest NGA has operated undetected within that country's borders." Barlow Decl. ¶ 31.

Revealing the existence of responsive records could, therefore, "damage U.S. foreign relations." Barlow Decl. ¶ 30. "[I]dentifying an interest in a particular matter or publicly disclosing a particular intelligence operation could well cause the affected or interested foreign government to respond in ways that would seriously damage U.S. national interests." Barlow Decl. ¶ 30. Other courts have found that "officially acknowledging" collection of intelligence "could hamper future foreign relations with the government of that country." *Riquelme v.*

Defendants' Motion for Summary Judgment - page 21

1  *CIA*, 453 F. Supp. 2d 103, 109 (D.D.C. 2006).   "The foreign government's

2  response could be of a diplomatic or economic nature, a ground for anti-American

3  propaganda, or a reason for retaliation against American citizens or other

4  American interests.  Such responses could reasonably be expected even though the

5  events may be several years past.  Perceptions of violation of sovereignty can

6  generate retribution even years later."  Barlow Decl. ¶ 30.

7       An original classification authority has determined that the confirmation of

8  the existence of responsive records could reasonably be expected to cause serious

9  damage to the national security, and the damage has been thoroughly documented

10 and explained throughout the accompanying declaration.   Mr. Barlow's

11 determination is, therefore, entitled to deference.   The fact of the existence or

12 nonexistence of responsive records is classified and protected from disclosure

13 pursuant to Exemption 1.  NGA is therefore entitled to summary judgment.

14 **III. NASA CONDUCTED A REASONABLE SEARCH**

15      NASA satisfied its FOIA obligation and is entitled to summary judgment.  A

16 search of NASA's records was unnecessary because plaintiffs' request falls outside

17 of the scope of NASA's records.  In response to plaintiffs' request, Dr. Peter H.

18 Hildebrand, a scientist at the NASA Goddard Space Flight Center ("GSFC"),

19 confirmed that, in 1996, NASA did not operate spacecraft capable of producing a

20 responsive image.  Young Declaration ("Decl.") ¶ 13.  Dr. Hildebrand is a scientist

1    and Deputy Director of the Sciences & Exploration Directorate at GSFC, and is

2    recognized as an expert in satellite imagery, and is also familiar with NASA's

3    overall satellite capability.   *Id.*   As such, there is nowhere within NASA that

4    responsive records are likely to be found.   In instances such as this, a search is

5    "futile and is unnecessary" because a person "personally familiar" with the subject

6    explains that the agency "neither maintains . . . nor uniformly collects such

7    information."   *Am.-Arab Anti-Discrim. Comm. v. Dep't Homeland Security*, 516 F.

8    Supp. 2d. 83, 87-88 (D.D.C. 2007).   *Cf. Meeropol v. Meese*, 790 F.2d 942, 952-53

9    (D.C. Cir. 1986) ("[T]he government can never conclusively refute a claim that yet

10   unproduced records exist.").

11       Nevertheless, out of an abundance of caution, NASA conducted "a search

12   reasonably calculated to uncover all relevant documents."   *Zemansky*, 767 F.2d at

13   571.   First, NASA's search was reasonable in scope.   Denise Young, NASA's

14   FOIA and Privacy Act Specialist, reviewed the functions of the offices located

15   within NASA's Headquarters to determine which of them could reasonably be

16   expected to have records responsive to plaintiff's FOIA request.   Young Decl.

17   ¶ 15.   Based on their functions, Ms. Young determined that the Photo/Imaging

18   Office, the History Office, the Library, and the Records Management Office were

19   the only Headquarters offices likely to have responsive records.   *Id.*   In addition, at

20   her discretion, Ms. Young also sent plaintiffs' FOIA request to all ten of the NASA

Defendants' Motion for Summary Judgment - page 23

1   Centers' FOIA offices nationwide.  *Id.* ¶ 16.  A FOIA officer at each of these

2   Centers, in turn, identified which offices within each Center were likely to have

3   responsive records, based on the age of the requested records.  *Id.* ¶¶ 22, 23.

4   NASA was not required to extend its search to other offices that would not be

5   likely have responsive records.  *E.g. Ray v. U.S. Dep't of Justice*, 908 F.2d 1549,

6   1558 (11th Cir. 1990) ("[T]he agency need not show that its search was exhaustive.

7   Rather, the agency must show beyond material doubt . . . that it has conducted a

8   search reasonably calculated to uncover all relevant documents." (internal

9   quotation marks and citations omitted)).

10      Ms. Young further describes in her declaration how the targeted offices

11   within NASA's Headquarters and at each of it Centers searched their respective

12   electronic and archive files to find responsive documents.  Young Decl. ¶¶ 20, 23.

13   In some offices, a limited search or no search was necessary because the relevant

14   authorities stated that the particular NASA Center or office did not functionally

15   possess the capability to produce a responsive record.  *Id.* ¶ 23(c).  *Am.-Arab Anti-*

16   *Discrim. Comm.*, 516 F. Supp. 2d. at 87-88.  "[A] search need not be perfect, only

17   adequate."  *See Meeropol*, 790 F.2d at 956.

18      The fact that NASA found no responsive records pursuant to its search is

19   irrelevant to the reasonableness of the search.  "The fact that a search has yielded

20   no records is immaterial to resolving a FOIA claim."  *Toolasprashad v. Bureau of*

Defendants' Motion for Summary Judgment - page 24

1   *Prisons*, 474 F. Supp. 2d 14, 15 (D.D.C. 2007); *see also Iturralde v. Comptroller*

2   *of the Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003) (sufficiency unrelated to

3   "fruits of the search").   Accordingly, the "failure of an agency to turn up one

4   specific document in its search does not alone render a search inadequate [and]

5   mere speculation that as yet uncovered documents might exist . . . is not enough to

6   undermine the determination that the agency conducted an adequate search for the

7   requested records."   *Morley v. CIA*, 508 F.3d 1108, 1120 (D.C. Cir. 2007) (internal

8   quotation marks and citations omitted).

9          NASA's declaration supports summary judgment in its favor.   Ms. Young's

10   "reasonably detailed" and "non-conclusory" declaration describes the method by

11   which NASA conducted an adequate search, and is entitled to a presumption of

12   "good faith."   *Zemansky*, 767 F.2d at 571.   That "presumption of good faith, . . .

13   cannot be rebutted by 'purely speculative claims about the existence and

14   discoverability of other documents.'"   *Safecard Servs., Inc. v. SEC*, 926 F.2d 1197,

15   1200 (D.C. Cir. 1991) (quotation omitted); *see also Maynard v. CIA,* 986 F.2d 547,

16   560 (1st Cir. 1993) (citation omitted).

17                                    **<u>CONCLUSION</u>**

18          For all of these reasons, NGA and NASA are entitled to summary judgment

19   on plaintiffs' FOIA claim.

Defendants' Motion for Summary Judgment - page 25

Dated: October 18, 2010

Respectfully submitted,

TONY WEST
Assistant Attorney General

JOHN R. TYLER
Assistant Branch Director

/s/ Karen P. Seifert
KAREN P. SEIFERT
Trial Attorney (NY Bar)
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Ph: (202) 305-0891
Fax: (202) 616-8474
karen.p.seifert@usdoj.gov

*Counsel for Defendants the National
Geospatial-Intelligence Agency and the
National Aeronautics and Space
Administration*

1

## <u>STATEMENT OF CONFERENCE PURSANT TO L.R. 7-3</u>

Defendant NASA attempted to confer with plaintiffs to resolve this issue without court intervention as follows:

On August 19, 2010, counsel discussed NASA's potential dismissal because the agency had not located responsive records.  In order to pursue dismissal, plaintiffs' counsel requested an official letter from NASA regarding its search.

On August 31, NASA sent such a letter to plaintiffs and asked for a response by September 3.  Having received no response, on September 8 and September 9, undersigned counsel emailed and called plaintiffs' counsel, requesting a response. On September 10, plaintiffs' counsel asked NASA for a more specific letter.

Before NASA had an opportunity to revise the letter, on September 14, plaintiffs' counsel stated that plaintiffs would not agree to dismissal unless NASA produced a sworn affidavit.   On September 15, NASA agreed to produce an affidavit, if plaintiffs would agree that they would follow through with dismissal upon receipt of the affidavit.

Plaintiffs did not respond to this proposal, despite follow-up communications between counsel on September 20 and September 22.   On September 23, undersigned counsel informed plaintiffs' counsel that that NASA would proceed with summary judgment.

1    Defendant NGA conferred with plaintiffs to attempt to resolve this issue

2  without court intervention as follows:

3    Pursuant to the Court's August 30, 2010, undersigned counsel attempted to

4  set up meetings with plaintiffs' counsel on August 31, September 8, and September

5  10.   Counsel spoke on September 10 for approximately one hour regarding

6  plaintiffs' questions.   Counsel also set up a meeting for September 13, which

7  plaintiffs delayed until September 14.  Counsel spoke again for approximately one

8  hour on September 14 and plaintiffs' counsel also sent a letter with additional

9  questions on that date.  On October 1, 2010, undersigned counsel sent a letter to

10  plaintiffs' counsel with answers to the questions raised in the September 14, 2010,

11  letter.  Counsels' discussions did not result in a resolution.


Dated: October 18, 2010                 Respectfully submitted,


                                        /s/ Karen P. Seifert
                                        KAREN P. SEIFERT
                                        Trial Attorney (NY Bar)
                                        United States Department of Justice
                                        Civil Division, Federal Programs Branch
                                        20 Massachusetts Avenue, N.W.
                                        Washington, D.C. 20001
                                        Ph: (202) 305-0891
                                        Fax: (202) 616-8474
                                        karen.p.seifert@usdoj.gov

                                        *Counsel for Defendants*