Peter A. Schey (Cal Bar #58232)
Carlos Holguin (Cal Bar # 90754)
Christopher Scherer (Cal Bar # 218205)
Center for Human Rights and Constitutional Law
256 S. Occidental Blvd.
Los Angeles, CA 90057
Telephone:  (213) 388-8693, ext. 304
Facsimile:  (213) 386-9484

Leonard Weinglass, Esq. (NY Bar #2016509)
6 West 20th Street #10A
New York, NY 10011-9263
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

_____

| | |
|---|---|
| CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW, LEONARD WEINGLASS, ESQ., | § § § § |
| | CIVIL ACTION NO: 10-CV-3375-MMM |
| Plaintiffs, | § § § § § | 
| v. | PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| | § § § |
| NATIONAL GEOSPATIAL-INTELLIGENCE AGENCY, NATIONAL AERONAUTICS AND SPACE ADMINISTRATION, | DATE:  JANUARY 31, 2011 TIME: 10:00 A.M. DEPT: COURTROOM 708 |
| | § § § |
| Defendants. | § |

_____

# TABLE OF CONTENTS

I.   Introduction ....................................................................................................1

II.  Background ......................................................................................................2

III. Argument .........................................................................................................3

    1.   Standards generally applied to FOIA exemptions and summary
        judgment motions ......................................................................................3

    2.   The NGA's Glomar Response is not proper under FOIA Exemption 3 ....6

    3.   The NGA's Glomar response is improper under FOIA Exemption 1 ......15

        1.   The NGA has not established that the requested records fall
            within the third category listed in E.O. 13,526 § 1.4, or at
            minimum there are disputed material facts regarding whether
            the requested records fall within the third category listed in
            E.O. 13,526 § 1.4............................................................................16

        2.   The NGA has not established that the requested records fall
            within the fourth category listed in E.O. 13,526 § 1.4, or at
            minimum there are disputed material facts regarding whether
            the requested records fall within the fourth category listed in
            E.O. 13,526 § 1.4............................................................................17

        3.   The NGA has failed to establish that disclosure of whether the
            requested records exist would damage the national security,
            or at minimum there are disputed material facts regarding
            whether disclosure whether the requested records exist would
            damage the national security........................................................19

IV. Conclusion .....................................................................................................24

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................4

*Balridge v. Shapiro*, 455 U.S. 345, 102 S. Ct. 1103, 71 L. Ed. 2d 199(1982)....................6

*Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725 (9th Cir. 1999) ......4

*Beck v. Dep't of Justice*, 302 U.S. App. D.C. 287, 997 F.2d 1489 (D.C. Cir. 1993)............................4

*Church of Scientology v. U.S. Dep't of the Army*, 611 F.2d 738 (9th Cir. 1979)...............................4

*CIA v. Sims*, 471 U.S. 159, 105 S. Ct. 1881, 85 L. Ed. 2d 173 (1985) ................................3

*Dep't of the Air Force v. Rose*, 425 U.S. 352 (1976) ...............................................3, 24

*Department of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 121 S. Ct. 1060, 149 L. Ed. 2d 87(2001) ...............................................5

*Essential Info., Inc. v. U.S. Info. Agency*, 134 F.3d 1165 (D.C. Cir. 1998) ........................6

*Fitzgibbon v. CIA*, 911 F.2d 755 (D.D.C. 1990) ...............................................8, 16

*Hunt v CIA*, 981 F.2d 1116 (9th Cir. 1992).................................................5, 15

*John Doe Agency v. John Doe Corp.*, 493 U.S. 146 (1989)...........................................3, 5

*Kamman v. United States IRS*, 56 F. 3d 46, 49 (9th Cir. 1995)..............................................4

*King v. United States Dep't of Justice*, 830 F.2d 210, 219 (D.C. Cir. 1987).....................................6

*Lion Raisins v. U.S. Dept. of Agriculture*, 354 F.3d 1072, 1079 (9th Cir. 2004) ........................3, 5

*Mace v. EEOC*, 37 F. Supp. 2d 1144, 1146 (E.D. Miss. 1999) .............................................4

*Minier v. CIA*, 88 F.3d 796, 803 (9th Cir. 1996)................................................4

*Morely v. CIA*, 699 F.Supp.2d 244 (D.D.C. 2010) ...............................................14

*Nat'l Res. Def. Council v. Dep't of Def.*, 388 F. Supp. 2d 1086 (C.D. Cal. 2005) ..........................4, 5

*Riquelme v. CIA,* 453 F. Supp. 2d 103 (D.D.C. 2006)................................................23

*Schoenman v. FBI*, No. 04-2202, 2009 WL 763065 (D.D.C. Mar. 19, 2009) ...........................8

*Wheeler v. CIA*, 271 F. Supp. 2d 132 (D.D.C. 2003) ...............................................15

1

*Zemansky v. United States Environmental Protection Agency*, 767 F.2d 569 (9th Cir. 1985) ..............5

2

3

4      **Statutes**

5      5 U.S.C. § 552 ...............................................................................................................................4

6      50 U.S.C. § 403-1 ..........................................................................................................................6

7      Fed. R. Civ. P. 56 ...........................................................................................................................3

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff's Opposition to Defendant's Motion for Summary Judgment

## OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

I.   INTRODUCTION

Plaintiffs in this action seek satellite images or related documentation under the Freedom …. ("FOIA"), 5 U.S.C. § 551, *et seq.*, from the National Geospatial-Intelligence Agency ("NGA"), which is an agency of the United States Department of Defense ("DOD"), regarding an incident on February 24, 1996, involving the shoot down of a civilian plane associated with the organization Brothers to the Rescue based in Miami, Floira, by a Cuban Mig-29 fighter plane.[1]

NGA's Motion for Summary Judgment [Doc. 23] ("MSJ") is based exclusively upon the Declaration of Barry M. Barlow. The NGA asserts that it may legally withhold even confirmation of the existence or nonexistence of the requested records.[2]

_____

[1] The governmental agency sued under the FOIA has the burden of proving that it has "conducted a search reasonably calculated to uncover all relevant documents." *Weisberg v. Dep't of Justice*, 227 U.S. App. D.C. 253, 705 F.2d 1344, 1351 (D.C. Cir. 1983).  Defendant NASA claims that it has conducted a thorough search of its records and located no records responsive to plaintiffs' request. Based on this declaration, the plaintiffs' intend to seek voluntarily dismissal of NASA from this case.

[2] Based solely on Mr. Barlow's declaration, the NGA argues that public knowledge even of the non-existence of the records sought is exempt from production pursuant to (1) FOIA Exemption 3, which exempts release under the National Security Act's ("NSA") definition of  "intelligence sources and methods," and (2) FOIA Exemption 1, which protects from disclosure records that are (i) authorized under criteria established by an Executive Order ("EO") to be kept secret in the interest of national defense or foreign policy, (ii) are properly classified pursuant to such EO, and (iii) EO No. 13,526, which requires that (a) an original classification authority has classified the information and determined that the disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and (b) the original classification authority *is able to identify or describe the damage* "as it pertains to … [i]ntelligence activities, intelligence sources or methods," (Sec. 1.4) (emph. supplied) or "foreign relations or foreign activities of the United States." Sec. 1.4(d).

Defendant the NGA's motion for summary judgment should be denied. Its declaration provides little more than unsupported, illogical, and conclusory statements. Plaintiffs' counter-declarations by national security experts make clear that defendants are not, at least at this stage of the proceedings, entitled to summary judgment.

II.   BACKGROUND

On December 29, 2009, plaintiffs Leonard Weinglass and the Center for Human Rights and Constitutional Law requested under FOIA the records from the NGA.[3]

The NGA acknowledged receipt of plaintiffs' request on January 12, 2010, Ex. C at 42, and denied plaintiffs' request on April 6, 2010, Ex. D at 45. The NGA responded that it "can neither confirm nor deny the existence or nonexistence of records responsive to [plaintiffs'] request." Id. at 47. The NGA stated that the "request is denied pursuant to sections '(b)(1)' and '(b)(3)' of the FOIA." Id. NGA initially

---

[3]  Plaintiffs FOIA request sought:

> 1. Any satellite images, satellite imagery, satellite photographs, or satellite video images of the area in which an incident took place on February 24, 1996 over or near the north coast of Cuba in which two aircraft flown by the Brothers to the Rescue organization of Florida were intercepted in flight and shot down by Cuban MiGs, including but not limited to satellite images, satellite imagery, satellite photographs, or satellite video images showing any of the Brothers to the Rescue or Cuban aircraft involved in the incident …
> 2. Any documents or records relating to the items sought in number 1 above including but not limited to reports requests, assessments, data compilations, directives, instructions, guidance, memoranda, correspondence, notes, indices, cables, telexes, telegrams, or letters, whether maintained in paper, digital, video, digital tape, audio tape or any other preserved form, regarding the aforementioned satellite images, satellite imagery, satellite photographs or satellite video images.

Defendant's Motion for Summary Judgment ("MSJ"), Doc. 23 at 2-3, Ex. B at 39. All references to lettered exhibits are to the exhibits filed with defendants' motion for summary judgment.

stated that 10 U.S.C. § 457 exempted the requested information under FOIA Exemption 3. Id. Subsequently, the agency determined that the National Security Act § 102A(i)(1) provided a more accurate justification for withholding the fact of the existence of records under Exemption 3. MSJ at 3 n. 1.

On April 9, 2010, plaintiffs appealed the NGA's denial of their FOIA request. Exhibit E at 49. NGA did not timely respond to plaintiffs' appeal and plaintiff filed suit in this Court on May 5, 2010. The NGA states that it ceased processing plaintiffs' administrative appeal after plaintiffs filed suit. Barlow Dec. ¶ 11.

III.    ARGUMENT

**1.    Standards generally applied to FOIA exemptions and summary judgment motions**

The FOIA provides private citizens access government records. *See CIA v. Sims*, 471 U.S. 159, 166-67, 105 S. Ct. 1881, 85 L. Ed. 2d 173 (1985).

Defendants agree that the FOIA's "basic purpose" reflects a "general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." MSJ at 5 (quoting *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152, 110 S. Ct. 471, 107 L. Ed. 2d 4628 (1989)).

The Supreme Court "has interpreted the disclosure provisions of FOIA broadly, noting that the act was animated by a 'philosophy of full agency disclosure.'" *Lion Raisins v. U.S. Dept. of Agriculture*, 354 F.3d 1072, 1079 (9th Cir. 2004) ( citation omitted). "[D]isclosure, not secrecy, is the dominant objective of the Act." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976).

A motion for summary adjudication should be granted only when "there is no genuine issue as to [a] material fact" and "the moving party is entitled to [adjudication] as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[S]ummary judgment will not lie if the dispute about a material fact

is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."). A genuine issue of material fact exists if the evidence is such that a reasonable juror could return a verdict for the non-moving party. Id., at 248. The interpretation of a statute, however, is purely a question of law. *Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 730 (9th Cir. 1999).

When no facts are in dispute, summary judgment is the procedural vehicle most often used by the courts to resolve FOIA cases.. *See, e.g., Nat'l Res. Def. Council v. Dep't of Def.*, 388 F. Supp. 2d 1086, 1094 (C.D. Cal. 2005) (quoting *Mace v. EEOC*, 37 F. Supp. 2d 1144, 1146 (E.D. Miss. 1999)).

However, where the government withholds documents pursuant to one of the enumerated exemptions of FOIA, "the burden is on the government to prove that a particular document falls within one of the exemptions." *Kamman v. United States IRS*, 56 F. 3d 46, 49 (9th Cir. 1995); *See also* 5 U.S.C. § 552(a)(4)(B)); *Church of Scientology v. U.S. Dep't of the Army*, 611 F.2d 738, 742 (9th Cir. 1979) ("The burden is placed upon the government agency to establish that a given document is exempt from disclosure.").

Under 5 U.S.C. § 552(a)(4)(B), "[a]n agency's refusal to disclose information is subject to de novo review by a district court." *Beck v. Dep't of Justice*, 302 U.S. App. D.C. 287, 997 F.2d 1489, 1491 (D.C. Cir. 1993)). The courts unquestionably possess jurisdiction to compel an agency to disclose improperly withheld agency records. *Minier v. CIA*, 88 F.3d 796, 803 (9th Cir. 1996); see also 5 U.S.C. § 552(a)(4)(B) ("On complaint, the district court of the United States … has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant").

In these circumstances, the  purpose of the FOIA--and the goal of courts reviewing FOIA decisions--is to achieve a "'workable balance between the right of the

public to know and the need of the Government to keep information in confidence to the extent necessary without permitting indiscriminate secrecy.'" *John Doe Agency*, 493 U.S. at 152 (quoting H.R. Rep. No. 89-1497, at 5(1966), reprinted in 1966 U.S.C.C.A.N. 2418, 2423).

"Unlike the disclosure provisions of FOIA, its statutory exemptions 'must be narrowly construed." *Lion Raisins*, 354 F.3d at 1079 (citing *John Doe Agency*, *supra*, 493 U.S. at 152); *Department of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8, 121 S. Ct. 1060, 149 L. Ed. 2d 87(2001) (courts should narrowly construe FOIA's exemptions).

When seeking summary judgment in FOIA cases, a government agency may rely upon declarations detailing the agency's search and explaining why the requested information falls within a claimed exemption. *See Natural Res. Def. Council v. Dep't of Def.*, 388 F. Supp. 2d 1086, 1094-9514 (C.D. Cal. 2005).

The Ninth Circuit has held that when addressing exemptions related to national security, "the district court [is] required to accord 'substantial weight' to [the agency's] affidavits," as long as they are not "controverted by contrary evidence in the record," *Hunt v. CIA*, 981 F.2d 1116, 1119 (9th Cir. 1992) (citation omitted) (emph. added), and are not "nonconclusory." *Zemansky v. United States Environmental Protection Agency*, 767 F.2d 569, 573 (9th Cir. 1985), (citation omitted) (emph. added).

"The … affidavits must describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemptions, and show that the justifications are not controverted by contrary evidence in the record …." *Hunt v. CIA*, supra, at 1119.[4]

---

[4] In order to uphold a *Glomar* response, "the affidavits [must be] *as specific as possible* given the nature of the information the [the agency seeks] to protect." *Id.* at 1120 (emphasis supplied). A supporting affidavit cannot support summary judgment "if [it is] conclusory, merely reciting statutory standards, or if [it is] too vague or sweeping. To accept an inadequately supported exemption claim would constitute an

As we discuss infra, in this case the affadivit provided by the NGA is conclusory and does not address the specifics of the request at issue in this litigation. Furthermore, it is contradicted by an expert's declaration.  Under the applicable FOIA statutes and precedent decisions, the NGA is not entitled to summary judgment. The NGA's declaration fails to adequately support the agency's position that it properly declined, under FOIA exemotions 1 and 3, to confirm or deny the existence or nonexistence of records responsive to plaintiuffs' request.

**2.      The NGA's Glomar Response is not proper under FOIA Exemption 3**

NGA first invokes Exemption 3, which applies to records that are "specifically exempted from disclosure" by other federal statutes "if that statute—establishes particular criteria for withholding the information or refers to the particular types of material to be withheld."  MSJ at 11, citing 5 U.S.C. § 552(b)(3).5 Under Exemption 3, "the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage." *Fitzgibbon*, 911 F.2d at 761-62.

In this case, the NGA asserts §102A(i)(1) the National Security Act of 1947 ("NSA"), 50 U.S.C. § 403-1(i)(1), as a statute that falls "within the scope" of Exemption 3. MSJ at 12. NSA § 102A(i)(1) mandates that the Director of National Intelligence ("DNI") "protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 403-1(i)(1). Sims, 471 U.S. at 167 (collecting cases).

With this statutory framework in mind, the NGA next argues that its affidavit shows that "the requested information falls within the scope of the statute," MSJ at 13,

---

abandonment of the trial court's obligation under the FOIA to conduct a *de novo* review." *King v. United States Dep't of Justice*, 830 F.2d 210, 219 (D.C. Cir. 1987) (internal quotations omitted).

5 In promulgating the FOIA, Congress included Exemption 3 to recognize the existence of collateral statutes that limit the disclosure of information held by the government, and to incorporate such statutes within FOIA's exemptions.  *See Balridge v. Shapiro*, 455 U.S. 345, 352-53, 102 S. Ct. 1103, 71 L. Ed. 2d 199(1982); *Essential Info., Inc. v. U.S. Info. Agency*, 134 F.3d 1165, 1166 (D.C. Cir. 1998).

quoting Minier, 88 F.3d at 800-01. In order to respond to plaintiffs' request, NGA claims that it would have to reveal "whether or not a satellite captured images of a specific spot on earth at a specific moment [some 12 years ago], and further, whether or not a satellite is able to capture images of the earth at a certain resolution." Id.  More accurately, whether or not a satellite some 12 years ago could capture images of the earth at a certain resolution.

The Barlow declaration claims that such an acknowledgment would expose "NGA's interest, ability, or involvement in obtaining satellite data, and the breadth and scope of that interest."  MSJ at 14, quoting Barlow Dec. ¶ 12.  In other words, Barlow asserts, by even stating that the requested records do not exist, foreign intelligence services could learn "whether or not NGA maintains an intelligence interest in specific activities or locations."  Id. quoting Barlow Dec. at ¶16.  Furthermore, the NGA argues that stating whether or not the records even exist would itself somehow, in Mr. Barlow's opinion, divulge the "capabilities or limitations" of NGA's satellites. Id. Therefore, the NGA concludes, revealing whether the images and any records regarding the images sought even exist, "falls within" NSA § 102A(i)(1), 50 9 U.S.C. § 403-1(i)(1). MSJ at 14. And, the NGA's determination, which is obviously based entirely on the Barlow declaration, is "entitled to a good faith presumption and [therefore] the NGA is entitled to summary." Id. at 15.

The NGAs involvement in satellite imagery is already public knowledge.[6] Indeed, the agency maintains a web site and issues news statements that publicly

_____

[6]  As the NGA acknowledges, in 1995, by Executive Order ("E.O.") No. 12,951, 60 Fed. Reg. 10,789 (Feb. 22, 1995), President Clinton declassified obsolete satellite imagery collected via the ARGON, CORONA, and LANYARD systems between 1959 and 1972. In 2002, the Director of Central Intelligence declassified obsolete satellite imagery collected via the KH-7 and KH-9 systems between 1963 and 1980. *See* National Archive, Press Release: National Archives Releases Recently Declassified Satellite Imagery, October 9, 2002, *available at* http:// www.archives.gov/press/pressreleases/2003/nr03-02.html. Satellite imagery related to

discusses its goals and accomplishments. See Exhibits 3 and 4. The NGA itself widely publicizes that it uses satellites to take photographic images of the earth.[7]  However, the NGA argues, it may "'refrain from disclosing the fact that it uses even the simplest of intelligence gathering methods.'"  MSJ at 15, quoting *Schoenman v. FBI*, No. 04-2202, 2009 WL 763065, at \*25 (D.D.C. Mar. 19, 2009).[8]

It hardly takes a satellite or national security expert to find the NGA's central factual assertions questionable and conclusory. At bottom, the issue here--at least as presented in the NGA's summary judgment motion--is simply whether confirming or denying the existence of the requested records would expose the "intelligence sources

---

all other missions "shall be kept secret in the interests of national defense and foreign policy until deemed otherwise by the Director of [National] Intelligence." E.O. 12,951.

[7] The NGA argues that the fact that some of its capabilities and satellite images is "generally known" by the public "does not lessen the statute's authority to exempt them from disclosure." MSJ at 14, *citing Fitzgibbon*, 911 F.2d at 763.  *Fitzgibbon*, however, dealt not with the result of an information gathering method, as this request does, but with the actual methods themselves: "*Fitzgibbon's* argument that methods that might be generally known - such as physical surveillance, or interviewing, or examination of airline manifests - must be disclosed fails [because a] foreign government can learn a great deal about the Agency's activities by knowing the public sources of information that interest the Agency." *Fitzgibbon v. CIA*, 911 F.2d 755, 763 (D.D.C. 1990).  Here the FOIA request does not seek details about the manner in which the NGA gathers intelligence data. It seeks extremely limited data collected some 14 years ago.

[8] In *Schoenman*, the requesting parties sought records from the CIA and other agencies about surveillance of identified individuals. The CIA's declaration, and the court, concluded that revealing the CIA's "intelligence source risks damaging not only the CIA's relationship with a particular source, but could also *hamper the CIA's ability to recruit future sources as well as endanger the United States' relationship with foreign governments that have agreed to provide sensitive information in strict confidence.* … [T]he documents at issue contain information concerning intelligence methods-- including field installations, foreign liaison relationships, cryptonyms and pseudonyms, as well as dissemination and control markings." *Id.* at \*65-\*66 (emphasis added).  Clearly, none of these risks are fairly applicable in the instant situation.

-8-

and methods" of the NGA protected from disclosure by 50 U.S.C. § 403-1(i)(1).
Nowhere does the Barlow declaration explain in coherent terms *why* confirming or
denying that the agency possesses such records would in any way expose the
"intelligence sources and methods" of the NGA. Releasing copies of images may or
may not do so, but that issue is not now before the court.

Assume that the NGA does *not* possess any images as requested. All that
confirming this fact would tell the requesting parties or the public is that on February
24, 1996, over or near the north coast of Cuba, the NGA did not capture and preserve
any satellite imagery. It would tell us *nothing* about whether such imagery was not
captured because no satellite was focused in that small area at the time of the incident,
or was not captured due to a lack of interest, or due to clouds, etc. The only thing such
a response would disclose is that the NGA does not possess such images. It would
disclose absolutely nothing about the NGA's "intelligence sources and methods."

John Pike is the director of GlobalSecurity.org, the world's premier military
information website, which he founded in 2000. Declaration of John Pike, Exhibit 1 ¶
1. He has extensive background in the public application of high resolution satellite
imagery, and has been recognized as an authority in intelligence related issues. *Id*. A
true and correct copy of his CV is attached to his declaration. *See* Exhibit 1,
Declaration of John Pike.

Mr. Pike declares as follows:

I do not believe that the conclusions in the Barlow declaration and the NGA's
position based on the Barlow declaration are well founded.  I believe that the
images and the related documents may be released, possibly with portions
segregated and withheld as appropriate, such that neither the requesting parties nor
anyone else could ever use the requested records to damage the national security as
it pertains to "[i]ntelligence activities, intelligence sources or methods," (Executive
Order , No. 13,526 Sec. 1.4) or "foreign relations or foreign activities of the United

States."  Sec. 1.4(d).

Despite my expertise, I am unable to determine from the Barlow declataion how release of the requested records, with appropriate segregation if necessary, would or may damage the national security as it pertains to "[i]ntelligence activities, intelligence sources or methods," (Executive Order , No. 13,526Sec. 1.4) or "foreign relations or foreign activities of the United States."  Sec. 1.4(d).

I believe that the fact of the existence or nonexistence of the requested images and the related documents may be made known to the Court and the requesting parties without the requesting parties or anyone else ever being able to use knowledge of the mere existence or nonexistence of the requested records to damage the national security as it pertains to "[i]ntelligence activities, intelligence sources or methods," (Executive Order , No. 13,526Sec. 1.4) or "foreign relations or foreign activities of the United States."  Sec. 1.4(d).

Despite my expertise, *I am unable to determine from the Barlow declataion how making known to the Court and the requesting parties the fact of the existence or nonexistence of the requested images and the related documents would or even may result in damage to the national security as it pertains to "[i]ntelligence activities, intelligence sources or methods," (Executive Order , No. 13,526Sec. 1.4) or "foreign relations or foreign activities of the United States."  Sec. 1.4(d).* The Barlow declaration does not explain and I know of no reason why the NGA's Glomar response is provided for under E.O. 12,958, section 3.6(a). Since knowledge of the existence or nonexistence of the requested materials could not reasonably ever do damage to the national security as it pertains to "[i]ntelligence activities, intelligence sources or methods," (Executive Order , No. 13,526Sec. 1.4) or "foreign relations or foreign activities of the United States."  Sec. 1.4(d), the existence or nonexistence of the requested materials is not properly itself classified information.

The Barlow declaration fails to explain why disclosure of the existence or nonexistence of the requested materials would reveal the NGA's "interest … in obtaining satellite data." Barlow dec. at ¶ 12.  *It is well known that satellites may capture images 24/7 of almost any place on earth and outer space. The fact that images may have been captured on a certain date 14 years ago in a small part of the ocean would not reveal to anyone anything about the NGA's "interests" … The vast majority of images that satellites capture may be of no interest to anyone and were captured despite not because of interests of those with access to the satellite's control and images.*

The Barlow declaration also fails to explain why disclosure of the existence or nonexistence of the requested materials would reveal the NGA's "ability … in obtaining satellite data." Images can be produced without showing anything about the specific capabilities of the satellite that took the images. *It is common knowledge that satellites exist and constantly image portions of the earth and outer space. It is also commonly known that satellite images can show subjects at a distance or remarkably close-up. Simply disclosing whether the requested records exist would tell no one, regardless of their expertise, anything whatsoever about the NGA's ability to gather images not well known from the agency's web site.*

In short, the Barlow declaration fails to explain why the NGA's mere confirmation of the existence or nonexistence of records responsive to the plaintiffs request would either acknowledge an intelligence interest, or lack thereof, in the time, location, incident, foreign nation, etc. concerning the subject of plaintiffs' request or reveal classified intelligence activities, intelligence sources and methods, or concern U.S. foreign relations.

*Confirming the existence or non-existence of the requested records would obviously also reveal nothing about the current interests, reach, locations, capabilities or limitations of NGA's intelligence activities and operations.* It would

Plaintiff's Opposition to Defendant's Motion for Summary Judgment

not reveal when or how the NGA might seek to collect data currently or in the future.

The incident involved that the requested records may include imagery about took place some 14 years ago and has been widely publicized in the domestic and international media. *The Barlow declaration fails to explain how disclosure of the existence or nonexistence of the requested materials could in any way be expected to have any impact whatsoever on the foreign policy considerations of the United Sates*. I am informed that the incident has been thoroughly addressed in the civil and criminal courts of the United States with full participation by the U.S. Government. The fact that the incident took place is public knowledge and the details of the incident have been parsed endlessly in the United States courts, the media, Congressional hearings, and international United Nations investigations. The NGA's position may have more legitimacy if the requested records dealt with an incident the facts about which were not already in the public domain.

In addition, the NGA's satellite imagery and analysis capabilities are obviously continually changing through advances in technology. *The NGA's capabilities today are significantly enhanced as compared to its capabilities in 1996. Confirming the existence or nonexistence of the requested records therefore also would not have any adverse results suggested in the Barlow declaration*. Indeed, releasing images and analysis from 1996, with redactions or segregation as appropriate if at all necessary, would not reveal the NGA's current, recent, or planned intelligence gathering capabilities, sources or methods.

Declaration of John Pike, Ex. 1, ¶¶ 3-12 (emphasis supplied).

Plaintiffs' expert Regis Heitchue's opinions are based upon his degree in Aeronautical Engineering, work as an engineer and manager in the fields of space technology, intelligence and national security, extensive experience in matters related to space-based National Intelligence Reconnaissance systems, and many years of work

with intelligence agencies including the National Geospatial-intelligence Agency (NGA), the National Reconnaissance Office (NRO), the Central Intelligence Agency (CIA), the Office of the Director of National Intelligence (ODNI), and other IC entities. *See* Declaration of Regis Heitchue, Ex. 2. at ¶ 1.

Mr. Heitchue declares as follows:

I believe that the images and the related documents may be releasable in their original form or in a modified [segregated] form so as to not reveal sensitive intelligence sources and methods.  I also do not believe that releasing the existence or non-existence of the images or related documents would reveal intelligence activities or intelligence sources or methods.

The images and related documents are subject to review under Executive Order 12951 which states: "In consultation with the Secretaries of State and Defense, the Director of Central Intelligence shall establish a comprehensive program for the periodic review of imagery from systems other than the Corona, Argon, and Lanyard missions, with the objective of making available to the public as much imagery as possible consistent with the interests of national defense and foreign policy …

The incident in question did not involve the U.S. military and therefore it cannot be claimed that release of the requested information would reveal the United State's defensive capabilities, strategies or resources …

There is precedent for the release of imagery, in modified form as necessary to protect intelligence sources and methods, acquired by space-based national reconnaissance systems other than the declassified Corona, Argon, and Lanyard missions. Such releases have occurred for a variety of reason to include environmental research and disaster relief …

The images and related documents plainly do not constitute [under Section 1.5 of Executive Order 12958] (a) military plans, weapons systems or operations, (b)

foreign government information; (f) United States Government programs for safeguarding nuclear materials or facilities, or (g) vulnerabilities or capabilities of systems installations, projects or plans relating to the national security.

In my expert opinion, the images, possibly as modified, and related documents, or the existence of same, are unlikely to reveal information concerning intelligence sources, methods or capabilities ....

Neither the acknowledgement nor the release of the requested images, possibly in modified form, or related documents could reasonably be expected to result in damage to national security, given the date of the incident, its notoriety and expansive media coverage, and the fact that the incident involved only the Cuban military and civilians.

Plaintiffs' Ex. 2, ¶¶ 4-9, 12-13 (emphasis in original).

The Court may owe deference to NGA's determination about potential damage to national security, but the FOIA and authoritative precedent also make clear that a *Glomar* claim under Exemption 3 may only be sustained when the material facts offered by the agency are uncontested, the agency's declaration is not conclusory, and the disclosure of the existence of the requested records would reasonably clearly itself disclose information Congress has exempted from pubic disclosure.[9] On all counts defendant NGA's motion for summary judgment fails.

---

[9] *See, e.g. Schulze v. FBI*, 2010 U.S. Dist. LEXIS 74360  at *58 (E.D. Cal. 2010). ("When an agency invokes the Glomar response it withholds essentially all information from the requesting party including information as to whether the requested records exist. The response is therefore the functional equivalent of a non-response and represents the most extreme departure from the policy purpose of the FOIA to inform and promote transparency in governmental affairs"); *Morely v. CIA*, 699 F.Supp.2d 244, 257 (D.D.C. 2010) (request sought "all records pertaining to CIA operations officer George Efythron Joannides"; the CIA limited its Glomar response to the request for "records regarding Mr. Joannides['s] participation in any *covert project, operation, or assignment*…." (emphasis added)); *Hunt v CIA*, 981 F.2d 1116, 1119 (9th Cir.

### 3.      The NGA's Glomar response is improper under FOIA Exemption 1

The NGA also invokes Exemption 1, which protects from disclosure records that are: "(A) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." MSJ at 15, quoting 5 U.S.C. § 552(b)(1). Based on the Barlow declaration, the NGA claims that "whether or not the records exist" is classified under E.O. 13,526, and thus subject to Exemption 1, because the withheld information satisfies four conditions:

> (1) an original classification authority is classifying the information; (2) the information is owned by, produced by or for, or is under the control of the United States Government; (3) the information falls within one or more of the categories of information listed in section 1.4 of th[e] order; and (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

---

1992) ("*The CIA affidavits explain that disclosure of the existence or non-existence of records pertaining to Eslaminia is tantamount to a disclosure whether or not he was a CIA source or intelligence target.* The affidavits then explain, with … particularity … why disclosure of this information would have a negative impact on CIA intelligence gathering"); *Wheeler v. CIA*, 271 F. Supp. 2d 132 (D.D.C. 2003) (request for records about a specific individual; records could not be revealed because "[p]erson-specific information is neither confirmed nor denied, and is not revealed in any manner by the [CIA], unless there has already been an acknowledged overt connection between the individual and the CIA. The CIA could not make a practice of disclosing the existence (or not) of only those files pertaining to persons not having a clandestine relationship, since that would render any non-confirming response a tacit admission of the existence of the very clandestine relationship [that] must keep secret").

MSJ at 16, *quoting* E.O. 13,526 § 1.1(a).[10]

1.     **The NGA has not established that the requested records fall within the third category listed in E.O. 13,526 § 1.4, or at minimum there are disputed material facts regarding whether the requested records fall within the third category listed in E.O. 13,526 § 1.4**

Under the Executive Order's third condition, Mr. Barlow claims that the existence or nonexistence of responsive records concerns 1.4(c) "intelligence activities (including covert action) [and] intelligence sources or methods." MSJ at 17, *quoting* Barlow Decl. ¶23. Second, Mr. Barlow states that the fact of the existence or nonexistence of records concerns section 1.4(d) "foreign relations or foreign activities of the United States." *Id*. quoting Barlow Decl. ¶23-32.

As plaintiffs' experts and logic make clear, confirming that the requested documents either do or do not exist would in no way implicate or disclose ther NGA's intelligence activities, intelligence sources or methods, or concern the foreign relations or foreign activities of the United States. As we discuss repeatedly in this brief (because the NGA repeats its arguments several times under different headings), the Barlow declaration fails in anything other than conclusory terms to explain the basis for any of its conclusions, including those quoted above. Plaintiffs' experts explain that simply confirming that the requested records exist or do not exist will not in any way disclose the intelligence activities, intelligence sources, or intelligence methods addressed in E.O. 13,526 § 1.4(c), or implicate "foreign relations or foreign activities of the United States" addressed in E.O. 13,526 § 1.4(d).

---

[10] When addressing the fourth condition, the court owes deference to NGA's determination about potential damage to national security. *See Fitzgibbon*, 911 F.2d at 766.

Plaintiff's Opposition to Defendant's Motion for Summary Judgment

2.   **The NGA has not established that the requested records fall within the fourth category listed in E.O. 13,526 § 1.4, or at minimum there are disputed material facts regarding whether the requested records fall within the fourth category listed in E.O. 13,526 § 1.4**

The NGA also argues that under the fourth condition of E.O. 13,526, the disclosure of whether response exist or do not exist "reasonably could be expected to cause serious damage to the national security of the United States by implicating intelligence activities, intelligence sources and methods, and U.S. foreign relations." MSJ at 18, quoting Barlow Decl. ¶¶24-32.

First, the NGA sserts that disclosure of the existencxe or nonexistence of the requested records could adversely impact intelligence activities (including covert action) [and] intelligence sources or methods "because it could expose the areas of the world where NGA's has, or has not been, targeting, and the technological capability, or lack thereof, of the satellite." *Id*. quoting Barlow Decl. ¶¶16-18, 24-29.  As we have already discussed *supra*, and as plaintiffs' experts declare, merely stating whether the requested records exist could in no way expose "the areas of the world" where NGA has obtained images, or its "technological capability."[11] For the reasons already discussed above, nor would confirming that the agency does not possess the requested records in any way conceivable tell anyone about the agency's "technological capability." The agency may not possess images because its satellites were turned off while flying over the minute portion of ocean where the incident took place, or the NGA's satellites may have been targetted elsewhere, or they may have been undergoing repair on that day, or they may have malfunctioned, etc. Neither the

_____

[11] Confirming that the NGA does not possess the requested documents will simply confirm that fourteen years ago the agency either did not gather imagery of a small sliver of the ocean during a period lasting a few minutes, or maybe did so but no longer possesses the images. This could not in any way inform the public or foreign powers about all of the "areas of the world" the NGA has images of dating back fourteen years.

Plaintiff's Opposition to Defendant's Motion for Summary Judgment

Barlow declaration nor the NGA have offered any rational or coherent explanation of why confirming that no requested records exist would or could in any way tell anyone about the 1996 or current or future "technological capability" of the agency's satellites.

Second, the NGA argues that disclosure of the existence or nonexistence of the requested materials "could adversely impact 'foreign relations or foreign activities of the United States' … because the presence of responsive records could be 'construed by a foreign government, whether friend or foe, to mean that NGA has collected intelligence information on its citizens or resident aliens.'"  MSJ at 18, *quoting* Barlow Decl. ¶31.

Again these assertions strain credulity. The cases relied upon by the NGA make clear that the claims made here are not the kind of credible, detailed and uncontradicted claims made by agencies in cases where the exemption has been sustained. While plaintiffs' experts opine that disclosing whether or not the requested records exist could not adversely impact foreign relations or foreign activities of the United States, it hardly requires an expert to reach the same conclusion. Neither the Barlow declaration nor the NGA ever explain how the presence or absence of responsive records may be "construed by a foreign government … to mean that NGA has collected intelligence information on its citizens or resident aliens." Barlow Dec. ¶ 31.[12]

The agency itself proudly announces in its press releases:

The Agency's mission is to provide timely, relevant and accurate geospatial intelligence in support of our national security. The term "geospatial intelligence" means the exploitation and analysis of imagery and geospatial

---

[12] It is unclear what the Barlow declaration even means. How or why would a foreign government "construe" the NGA's confirming that the requested records exist or do not exist to mean that the NGA has collected "intelligence information" on its citizens or resident aliens? Any foreign government can go on the NGA's web site, or read published articles about the NGA, and understand that the agency's entire mission is to gather satellite intelligence imagery of the earth, including the ocean.

Plaintiff's Opposition to Defendant's Motion for Summary Judgment

information to describe, assess and visually depict physical features and geographically referenced activities on the Earth. Geospatial intelligence consists of imagery, imagery intelligence and geospatial (e.g., mapping, charting and geodesy) information.

Exhibit 3, NGA News Relase of September 8, 2008, (announcing the "NGA Celebrates Successful Launch of GeoEye-1"); *see also* Exhibit 4, NGA News Release September 18, 2007, (announcing "NGA Celebrates Successful Launch of WorldView-1"). In its press releases the NGA even invites all comers, including foreign governments, to "Visit our Web site at http:// www.nga.mil." *Id.*

> **3.  The NGA has failed to establish that disclosure of whether the requested records exist would damage the national security, or at minimum there are disputed material facts regarding whether disclosure whether the requested records exist would damage the national security**
>
> > **(a)  The NGA has not established that disclosure of whether the records exist would damage intelligence activities, sources, and methods, or at minimum there are disputed material facts whether such disclosure would damage intelligence activities, sources, and methods**

The NGA next argues that if it were to confirm or deny the existence of records responsive to plaintiffs' request, it would "reveal whether or not NGA maintains an intelligence interest in a particular area of world, as well as the breadth and scope of any such interest." MSJ at 18-19, citing Barlow Decl. ¶12.  Such a response would "necessarily expose" whether NGA intelligence methods "have or have not been utilized for a specific target." *Id*. at 19 citing Barlow Decl. ¶ 14.  Consequently, Mr. Barlow claims, foreign intelligence services and terrorist organizations would "gain valuable knowledge about which targets are [sic] have been, and may continue to be, monitored by NGA." *Id. citing* Barlow Decl. ¶24. Knowing "where and when" NGA seeks to collect data, foreign adversaries could seek to provide false sources of data or to prevent collection of data altogether." *Id. quoting* Barlow Decl. ¶16.

This all sounds sinister, but stripped of its hyberbole, the NGA's claims are conclusory and unauthentic. As plaintiffs' experts have explained, knowing whether or not the requested records exist would hardly inform anyone about where and when the NGA seeks to collect data.[13] *It is public information that the defendants use satellites to "determine where things and people could be," and "scour[s] the world" to do so.* *See* "Secretive Map Agency Opens its Doors," David Ensor, December 13, 2002, http://archives.cnn.com/2002/US/12/09/map.makers/. "If, for example, a prisoner tells the CIA he knows of an al Qaeda safe house on a dead-end street in Karachi, Pakistan, [we] can find every house that fits that description." *Id.*[14]

---

[13] Indeed, the NGA has routinely released to the public information about where and when it obtains satellite imagery:

> In spring 2008, NGA partnered with U.S. Federal Emergency Management Agency (FEMA) to provide direct support for those affected by the Midwest floods. NGA posted imagery and mapping products on our NGA-earth.org website for residents and first responders to see the damage and watch recovery efforts. … In the fall of 2007, NGA provided over 150 geospatial intelligence products to FEMA to lend support in combating the California wildfires. … NGA provided substantial support to the Olympic games in Athens, Greece in 2004 and Torino, Italy in 2006. … NGA lends its geospatial knowledge in helping officials create geospatial products including maps of the locations used for the events and surrounding key infrastructure. … NGA supported recovery efforts for hurricanes Katrina and Rita in 2005…. NGA provided imagery from commercial and U.S. government satellites and from airborne platforms. … NGA can create highly accurate terrain visualization manoeuvring to give 3D fly-throughs and motion video for better access of a point on the Earth. NGA can also create point targeting, route analysis, and site selection products based on partners' needs.

https:// www1.nga.mil/About/WhatWeDo/Pages/default.aspx

[14] "If it's something manmade or natural on the face of the earth and it has national security implications, then we map it, chart it, analyze it, and make that information available," says Sue Meisner, an NGA spokeswoman. *See* "Geospatial-Intelligence Agency Provides More Than Just Maps," Steven Donald Smith, May 18, 2006, http:// www.defense.gov/news/newsarticle.aspx?id=15734. Scott Kather, an NGA geospatial

If the requested records do not exist, nothing at all about where and when the NGA collects data could be presumed by anyone. If the requested records do exist, neither the public nor any foreign power would "gain valuable knowledge" about which targets are monitored by the NGA more useful than they can gather by visiting the NGA's web site or reading its press releases.

The NGA also argues that if it were to confirm or deny the existence of records responsive to plaintiffs' request, it would inevitably "reveal the technological capability, or lack thereof, of a satellite." MSJ at 19, citing Barlow Decl. ¶¶ 12, 25. This "may" reveal NGA's "sophisticated technological tools, liaison relationships, and NGA's identification of targets for intelligence collection activity, among other sensitive sources and methods." *Id*. quoting Barlow Decl. ¶ 25.

Plaintiffs' experts and common sense indicate that merely confirming or denying that the requested records exist will in no way disclose anything about the NGA's capabilities not already known by access to their web site and news releases. Indeed, one could learn thousands of times more about the agency's "technological capability" by visiting the agency's web site and reading its press releases and public statements by its analysts than by knowing whether or not it possesses imagery of an incident that took place some fourteen years ago.

The NGA next claims that if it did *not* have responsive imagery, this "might" reveal that the NGA "lacked the technological capability necessary to capture responsive imagery." MSJ at 19-20 Barlow Decl. ¶¶16, 17.  With such information, "foreign intelligence services" would gain "valuable knowledge about NGA's capability to monitor targets." *Id. citing* Barlow Decl. ¶17.  The NGA's claims are frivolous. All that "foreign intelligence services" may learn if the NGA conceded that

---

analyst, states that "If [the U.S. military] thought there were some bad guys at a particular coordinate, *I would find an image of that coordinate* …" *Id*. (emphasis supplied)

Plaintiff's Opposition to Defendant's Motion for Summary Judgment

it did not possess the requested records is that on February 24, 1996, the NGA, for any number of reasons, did not monitor the precide piece of ocean where the incident took place. Neither the requesting parties nor any "foreign intelligence services" would have the slightest idea *why* the NGA did not gather imagery of the part of the ocean in question during one hour on one day over fourteen years ago.

Reaching further and further into the realm of imagination, with no concrete rational explanation, the NGA argues that by reviewing its "officially-released" position that the requested records either exist or do not exist, foreign intelligence services "may … 'deduce means and methods (from disparate and even seemingly unimportant details) to defeat NGA collection efforts.'" MSJ at 20, *quoting* Barlow Decl. ¶ 28.[15] Plaintiffs' experts see no way that anyone, whether the requesting parties or a foreign intelligence expert, could ever "cobble together" a "picture" of the NGA's capabilities and intelligence interests by knowing whether or not images exist of the 1996 incident.

The NGA concludes this argument by offering that it's affidavit provides "sufficient detail" to demonstrate "the logical connection" between the fact of the existence or nonexistence of records and the agencies' proper decisions to neither confirm nor deny it. MSJ at 20. Plaintiffs, and their two national security and satellite experts, respectfully disagree. The FOIA has substance and meaning. The courts role is not simply to apply a toothless form of judicial review. There are significant material facts in dispute regarding the NGA's various and often outlandish claims, claims which go largely unexplained other than through conclusory statements belied by the very information the NGA trumpets on its web site and news releases.

------

[15] However, the Barlow declaration never explains in understandable terms how such foreign intelligence services (or anyone for that matter) would be able to "cobble together [the NGA's] responses to create a picture of NGA's overall capabilities and intelligence interests." *Id*. *quoting* Barlow Dec. ¶¶18, 28.

**b.** **The NGA has not established that disclosure of whether the requested records exist would damage the United States foreign relations, and at minimum there are disputed material facts whether such disclosure would damage the United States foreign relations**

Finally, the NGA argues that revealing the existence or nonexistence of the requested records could adversely impact U.S. foreign relations. MSJ at 21. If the NGA were to confirm the existence of responsive records, such a response, the agency claims, could be "construed by a foreign government, whether friend or foe, to mean that NGA has collected intelligence information on its citizens or resident aliens." *Id. quoting* Barlow Dec. ¶ 31.[16]

If these points were made in the 18th Century, and the NGA had secretly developed and successfully deployed satellites with intelligence gathering capabilities, and Congress had enacted a FOIA along the lines of its present form, the NGA's argument may make some sense. For all of the reasons we have already discussed, the NGA's points have no merit whatsoever. It is not that it "may be generally known" that the NGA "collects foreign satellite intelligence," this is most certainly known to anyone who uses the internet and knows how to read. A specific "acknowledgement" that the requested records either exist or do not exist would therefore add nothing to the world's knowledge about the NGA's ability to gather images "within [other] country's borders" and could not, except in someone's uninformed imagination, "damage U.S. foreign relations."

The NGA's reliance on *Riquelme v. CIA,* 453 F. Supp. 2d 103, 109 (D.D.C. 2006) is entirely misplaced. MSJ at 22. In that case, the requesting party sought

---

[16] The NGA argues that even though it "may be generally known … [that the NGA] collects foreign satellite intelligence and conducts satellite operations in other countries," a specific "acknowledgement" could "suggest [that the] NGA has operated undetected within that country's borders." MSJ at 21, *quoting* Barlow Dec. ¶ 31. Revealing the existence of responsive records "could, therefore, 'damage U.S. foreign relations.'" *Id. quoting* Barlow Decl. ¶ 30.

documents from the CIA "regarding certain United States activities in Paraguay during certain years within the period ranging from 1970 to 1984." *Riquelme*, 453 F. Supp.2d at 105.[17] "[B]ecause there is not an acknowledged overt connection between the Agency and the individuals" subject to the FOIA, the CIA correctly provided a *Glomar* response. *Id*. at 109.[18] Such a concern does not exist here when the NGA has already publicly acknowledged its ability to collect satellite images of the planet, to say nothing of the fact that since at least the days of the Cuban Missile Crisis, the Cuban government has obviously known that the United States takes images of the island, and if it miracuously did not understand this, all it had to do over the past fifteen years was use the internet to access the NGA's (or its predecessor NIMA's) web site.

IV.   CONCLUSION

The NGA concludes its argument stating that "the damage [that could be caused by affirming the existence or nonexistence of the requested records] has been thoroughly documented and explained throughout the accompanying declaration." MSJ at 22.  That is not the case.  Mr. Barlow's statements are conclusory and filled with hyperbole, and therefore are entitled to no deference whatsoever. "[D]isclosure, not secrecy, is the dominant objective of the [FOIA]." *Dep't of the Air Force v. Rose*, *supra*, 425 U.S. at 361. The NGA has failed to meet its burden of proof, and material facts are in issue as set forth in plaintiffs' experts' declarations. The NGA is therefore

---

[17] Specifically, the request sought documents relating to "[a]ctivities of agents or agencies of the government of the United States of America in connection with the ascension to power of General Alfredo Stroessner in Paraguay." *Id*. at 105, n.2.

[18] The documents would only exist if the "CIA had engaged in clandestine activities, had established clandestine relationships, or had clandestine intelligence interests in the subjects and activities" set forth in the FOIA request. *Id*. at 109. "[O]fficially acknowledging that the CIA has recruited or collected intelligence information on a foreign national, or conducted clandestine activities in a foreign country … could hamper future foreign relations with the government of that country." *Id*. at 109.

1   not entitled to summary judgment.

2   Dated: January 11, 2011              Respectfully submitted,

3

4                                       Leonard Weinglass

5                                       Peter A. Schey

6                                       Carlos Holguin
                                        Christopher Scherer
7                                       Center for Human Rights and
                                        Constitutional Law
8

9

10                        By:

11                                      Peter Schey
12                                      *Attorneys for Plaintiffs*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>Proof of Service</u>

I, Christopher Scherer, declare and say as follows:

      1. I am over the age of eighteen years and am not a party to this action. I am employed in the County of Los Angeles, State of California.  My business address is 256 S. Occidental Blvd., Los Angeles, California, 90057, in said county and state.

      2. I hereby certify that a true and correct copy of the foregoing Opposition to Defendants Motion for Summary Judgment was lodged and served via the District Court's electronic filing system on this 11th day of January, 2011, subject to an *ex parte* application.  The Opposition was also served on defendant's counsel via email.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 11th day of January 2011, at Los Angeles, California.



Christopher Scherer